**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| SARAH GORDON-HORTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 12-CV-226-PJC |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of the ) | |
| Social Security Administration,[1] ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Claimant, Sarah Gordon-Horton ("Gordon-Horton"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Gordon-Horton appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Gordon-Horton was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**[2]

Gordon-Horton was 26 years old at the time of the hearing before the ALJ on September 19, 2011. (R. 33, 43). She graduated from high school. (R. 43). She had a driver's license, but when first obtaining her license, she took the oral examination. (R. 44-45).

Gordon-Horton testified that she had last worked in February 2009 at a fast food job. (R. 46). She said her anxiety and depression were her biggest obstacles to working. (R. 48). She said that she went to the grocery store, but she played music on her MP3 player to alleviate her anxiety that people were talking about her or staring at her. (R. 54). She normally went shopping with someone else. *Id.*

Gordon-Horton said that it took a while for her to trust a doctor or a counselor, and she found it easier to trust women. (R. 58). She did not do group therapy sessions because of her inability to handle more than one or two people. *Id.* Even when she took her boys outside to play, she would only let them stay for a few minutes, so that she could go back inside. (R. 59). She did most of her socializing by telephone or by talking to her friends over the Internet using Skype. (R. 58-60). She avoided church due to bad memories. (R. 60).

When completing the paperwork for her disability claim, she had help from other people, including explanations of questions asked on forms. (R. 60-61). She watched a lot of television, but she might remember only 5 or 10 minutes of a show and lose the point of the story. (R. 61).

---

[2] While Gordon-Horton originally had included physical impairments in her claim of disability, those claims were not included in the appeal. Plaintiff's Opening Brief, Dkt. #17, p. 1. The Court, therefore, has not included any discussion of Gordon-Horton's physical impairments.

Gordon-Horton testified that when she had applied for jobs, she had help completing applications. (R. 62). At work, she would avoid her boss and stay in her area. *Id.* She had panic attacks when she saw police officers due to childhood trauma. (R. 62-63). She was very careful to make sure that her doors and windows were locked, and the slightest noise made her jump. (R. 63). She did not sleep well, even with the medications her doctors prescribed. *Id.*

The administrative transcript includes records from Stroud Public Schools containing copies of individualized education program documents reflecting that Gordon-Horton had accommodations of disabilities and was at times placed in special education classrooms. (R. 217-22).

The administrative transcript includes a letter "To Whom It May Concern" from the Rogers County Literacy Council dated April 5, 2011. (R. 192). The letter states that Gordon-Horton's scores on a standardized test indicated that she was performing at a kindergarten and first grade level. *Id.* Other screening results said that Gordon-Horton had a moderate level of attention difficulty. (R. 204). Another screening result said that Gordon-Horton had a severe level of "Visual Stress Syndrome Difficulty." (R. 207). This assessment said that visual stress syndrome involves individuals who have difficulty seeing printed letters and words when viewing black print on white paper. *Id.*

Records reflect that Gordon-Horton received counseling assistance from Grand Lake Mental Health Center (the "Grand Lake Clinic") from 2009 to 2011. (R. 260-82, 351-85, 409-22, 497-540, 553-93).[3] Gordon-Horton saw Weldon Mallgren, D.O. at the Grand Lake Clinic on December 28, 2009. (R. 263-64). She was prescribed Celexa, Desyrel, and Neurontin. (R. 264). On January 26, 2010, Gordon-Horton saw a certified physician's assistant, and she said that the sleeping medication did not work and that her anxiety was worse. (R. 261-62). The provider assessed her on Axis I[4] with major depressive affective disorder, recurrent episode, severe, with psychotic features; and post traumatic stress disorder ("PTSD").[5] (R. 262). Gordon-Horton's medications were adjusted. *Id.*

The administrative transcript contains an undated Mental Status Form that is apparently signed by Peteryne Miller, M.D. of the Grand Lake Clinic. (R. 283). While the form is undated, an accompanying page indicates that it was received by the Social Security Administration office on February 25, 2010. (R. 284). The form says that Gordon-Horton exhibited psychomotor retardation and slow thought processes. *Id.* Gordon-Horton indicated increased anxiety in public

---

[3] It appears that the Grand Lake Clinic had multiple locations and that some of Gordon-Horton's interaction with staff was by "Tele-Medication Service." For ease of reference, the Court uses the designation "Grand Lake Clinic" to refer to all of the services from this organization, regardless of the location or whether the services were conducted by Tele-Medication Service.

[4] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[5] The provider used numerical codes to express her assessments. These codes are from the International Classification of Diseases, 9th edition - Clinical Model coding system, and this is a medically-recognized ranking of diagnoses. *See Little Company of Mary Hosp. v. Shalala*, 24 F.3d 984, 986-87 (7th Cir. 1994). For ease of reference, the Court has converted the numerical codes to verbal assessments.

4

places and when facing conflict. *Id.* Prognosis was fair. *Id.* Gordon-Horton was able to carry out simple directions, but she could not perform complex tasks. *Id.* Gordon-Horton reported having difficulty managing stressors, including interactions with co-workers and customers. *Id.* Diagnoses on Axis I were major depressive affective disorder, with psychotic features; and PTSD. *Id.* Gordon-Horton's Global Assessment of Functioning ("GAF")[6] was assessed as 42, with her highest GAF in the past year as 48.

On March 15, 2010, Gordon-Horton presented to the emergency department of Jane Phillips Medical Center with depression and suicidal ideation. (R. 285-300). She was transferred to Wagoner Community Hospital. (R. 292). She was treated at Wagoner Community Hospital and discharged on March 19, 2010. (R. 342-50).

An unsigned Grand Lake Clinic form completed on March 23, 2010 assessed Gordon-Horton's current GAF as 42, and her highest in the past year as 48. (R. 384). Gordon-Horton was seen by Dr. Miller at Grand Lake Clinic on April 8, 2010, and her assessments were again major depressive affective disorder, recurrent episode, severe, with psychotic features; and PTSD. (R. 359-60). Prescription medications were adjusted. (R. 360). Gordon-Horton returned and saw Dr. Miller on April 22, 2010, and assessments were the same. (R. 357-38). A note was

---

[6] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

made that Gordon-Horton reported having conversations with her deceased mother. (R. 358). Prescription medications were adjusted. *Id.*

Gordon-Horton saw a certified physician's assistant at the Grand Lake Clinic on May 17, 2010. (R. 415-17). Assessments remained major depressive affective disorder, recurrent episode, severe, with psychotic features; and PTSD, and her medications were continued. (R. 416-17). Gordon-Horton was seen by Dr. Miller on June 14, 2010, and she reported continuing night terrors. (R. 412-14). Her medications were adjusted. (R. 414). The certified physician's assistant adjusted Gordon-Horton's medications again on July 12, 2010. (R. 409-11). Gordon-Horton saw Dr. Miller on August 19, 2010, and her medications were put on hold until it was determined whether Gordon-Horton was pregnant. (R. 535-36).

Gordon-Horton returned to the Grand Lake Clinic on September 17, 2010, and apparently her medications were resumed. (R. 530-31). An unsigned Grand Lake Clinic document dated September 21, 2010 assigned a diagnosis of borderline personality disorder on Axis II. (R. 520). It stated Gordon-Horton's current GAF as 44, and her highest GAF in the past year as 48. *Id.* Gordon-Horton saw Dr. Miller on October 20, 2010, stating that she was satisfied with her medications except for an inability to sleep. (R. 515-16). Axis I diagnoses remained major depressive affective disorder, recurrent episode, severe, with psychotic features; and PTSD. (R. 516). On Axis II, Gordon-Horton was diagnosed with borderline personality disorder. *Id.* Her medications were adjusted. *Id.* Gordon-Horton saw an advanced registered nurse practitioner on December 3, 2010, and she said that she was still having difficulty sleeping and experiencing anxiety. (R. 508-09). Her medications were adjusted. (R. 509).

Gordon-Horton saw the nurse practitioner at the Grand Lake Clinic again on January 6, 2011, and she complained that her depression medications were not working. (R. 497-98). It

was noted that she was sleeping a lot. *Id.* The record shows no diagnosis on Axis II, and Gordon-Horton's medications were adjusted. (R. 498). Gordon-Horton saw the nurse practitioner on March 18, 2011, and she reported sleeping only two hours at night and having anxiety. (R. 574-75). She also reported continuing to hear voices, see things, and experience nightmares. (R. 575). No Axis II diagnosis appears on the form, and Gordon-Horton's medications were adjusted. *Id.*

An unsigned Grand Lake Clinic form dated March 18, 2011 reflected Axis I diagnoses of major depressive affective disorder, recurrent episode, severe, with psychotic features; and PTSD. (R. 577). On Axis II, Gordon-Horton was diagnosed with borderline personality disorder. *Id.* Gordon-Horton's current and highest GAF were stated as 48. *Id.*

Gordon-Horton saw the nurse practitioner again on April 29, 2011, and she reported racing thoughts and lack of sleep. (R. 568-69). Medications were adjusted. (R. 569).

Agency nonexamining consultant Deborah Hartley, Ph.D. completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment on May 3, 2010. (R. 386-403). On the Psychiatric Review Technique Form, for Listing 12.04, Dr. Hartley noted Gordon-Horton's mood disturbance with depressive syndrome. (R. 389). For Listing 12.06, Dr. Hartley noted Gordon-Horton's anxiety evidenced by recurrent and intrusive recollections of a traumatic experience. (R. 391). For the "Paragraph B Criteria,"[7] Dr. Hartley

---

[7] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

found that Gordon-Horton had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with one or two episodes of decompensation. (R. 396). In the "Consultant's Notes" portion of the form, Dr. Hartley summarized Gordon-Horton's claims and her hospitalization in 2010 for depression with suicidal gesture. (R. 398). Dr. Hartley summarized Gordon-Horton's treatment at the Grand Lake Clinic, although some of that history was erroneously labeled as a psychological consultative examination. *Id.* She described Gordon-Horton's activities of daily living and stated that there could be possible improvement if Gordon-Horton "would be compliant with treatment." *Id.*

In Dr. Hartley's Mental Residual Functional Capacity Assessment, she found that Gordon-Horton was markedly limited in her ability to understand, remember, and carry out detailed instructions. (R. 400). Dr. Hartley also found Gordon-Horton to be markedly limited in her ability to interact appropriately with the general public. (R. 401). She found no other significant limitations. (R. 400-01). In her narrative comments, Dr. Hartley said that Gordon-Horton could perform simple tasks with routine supervision, and she could relate to supervisors and peers on a superficial work basis. (R. 402). Gordon-Horton could not relate to the general public, and she could adapt to a work situation. *Id.*

## Procedural History

Gordon-Horton filed an application in February 2010 for Title XVI supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (R. 118-21). The application was denied initially and on reconsideration. (R. 77-83). A hearing before ALJ David W. Engel was held on September 19, 2011. (R. 33-72). By decision dated October 28, 2011, the ALJ found that Gordon-Horton was not disabled. (R. 11-27). On April 6, 2012, the Appeals

Council denied review of the ALJ's findings.  (R. 1-5).  Thus, the decision of the ALJ represents a final decision for purposes of this appeal.  20 C.F.R. § 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).  Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[8]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

---

[8] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.*, (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

At Step One, the ALJ found that Gordon-Horton had not engaged in substantial gainful activity since her application date of January 21, 2010. (R. 14). At Step Two, the ALJ found that Gordon-Horton had severe impairments of back and knee pain, obesity, learning disorder, major depressive disorder, and PTSD. *Id.* At Step Three, the ALJ found that Gordon-Horton's impairments did not meet any Listing. (R. 15).

The ALJ's RFC determination was lengthy. (R. 17, 25). The following is the portion of the ALJ's RFC determination that is relevant to Gordon-Horton's appeal based on mental issues:

> [Gordon-Horton] is able to understand, remember, and carry out simple to moderately detailed instructions in a work-related setting, and is able to interact with co-workers and supervisors, under routine supervision. She is unable to interact with the general public more than occasionally, regardless of whether that interaction is in person or over a telephone.

*Id.* At Step Four, the ALJ found that Gordon-Horton was not able to perform any past relevant

work. (R. 25). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Gordon-Horton could perform, considering her age, education, work experience, and RFC. *Id.* Thus, the ALJ found that Gordon-Horton was not disabled since her application date of January 21, 2010. (R. 27).

## Review

Gordon-Horton asserts several arguments on appeal. The Court agrees that the uncontroverted evidence that Gordon-Horton had both low level of function in reading, spelling, and math and assessed learning disabilities was not sufficiently considered. For this reason, the Court reverses and remands for further consideration.

Gordon-Horton proffered evidence through the application process that she had a low level of function in reading, spelling, and math and learning disabilities. (R. 192-208, 217-22). When Gordon-Horton was a senior in high school in 2003, a summary of the results of standardized testing completed from 1999 through 2003 reflected that Gordon-Horton's highest reading score was at the third grade level. (R. 216). Spelling was consistently at the first grade level. *Id.* Her highest math score was at the fourth grade level. *Id.* Gordon-Horton also submitted evidence of testing and evaluations completed in 2011 by the Rogers County Literacy Council and the Ruth G. Hardman Adult Literacy Service in Tulsa. (R. 192-208). A standardized test score indicated that Gordon-Horton was performing at the kindergarten and first grade level for reading and spelling. (R. 192-93). She was assessed with a moderate level of attention difficulty and with a severe level of visual stress syndrome difficulty. (R. 204, 207).

The ALJ did a good job of summarizing the evidence of Gordon-Horton's low level of function in reading, spelling, and math, as well as her assessed learning disabilities. (R. 20-21). While he accurately recited this evidence, there is no indication that he assigned any functional

limitations to it. The ALJ's omission of any functional limitation based on this evidence is reflected in the similarity his RFC determination has to the assessments of Dr. Hartley. (R. 17, 25, 386-403). The ALJ said that he gave "great weight to the mental RFC determined by the State Agency Physicians, as it is consistent with the evidence of record." (R. 23).

The ALJ's conclusion that the mental RFC determined by Dr. Hartley was consistent with the evidence is problematic because it appears that the uncontroverted evidence of Gordon-Horton's low level of function in reading, spelling, and math and her learning disabilities was not available to Dr. Hartley. Dr. Hartley gave her opinions in May 2010, and her review was therefore limited to a few records of treatment at the Grand Lake Clinic and the records of Gordon-Horton's March 2010 hospitalization at the Jane Phillips Medical Center and the Wagoner Community Hospital. (R. 398). She did not reference records from Stroud High School, and the other evaluations were conducted in 2011, several months after Dr. Hartley completed her forms.

Therefore, the ALJ formulated an RFC determination by relying on the report of an expert who did not review the uncontroverted evidence of Gordon-Horton's low level of functioning in reading, spelling, and math and her learning disabilities. Had a consultative examination been completed, or had the agency experts reviewed the evidence that Gordon-Horton submitted regarding her level of functioning and her learning disabilities, the experts may have assessed more limitations or a more severe degree of limitation on the Psychiatric Review Technique form or on the Mental Residual Functional Capacity Assessment form. The reports of Dr. Hartley, because she did not review the Stroud High School records and she could not have reviewed the 2011 evidence, did not take into account this important evidence. Dr. Hartley's reports therefore cannot be substantial evidence to support the ALJ's RFC determination. *Stephens v. Apfel*, 134

F.3d 383, 1998 WL 42524 at *2 (10th Cir.) (unpublished).  In *Stephens*, the court had multiple problems with the ALJ's decision, but one was the "obvious" problem of using a "stale" 1989 consulting report instead of a current 1993 treating assessment.  *Id.*  More recently, the Tenth Circuit said that an ALJ's reliance on a "patently stale" opinion was "troubling," and the court encouraged the ALJ to obtain an updated exam or report on remand.  *Chapo v. Astrue*, 682 F.3d 1285, 1293 (10th Cir. 2012).

Because the reports of Dr. Hartley did not take into account uncontroverted evidence regarding Gordon-Horton's level of functioning in reading, spelling, and math and her learning disabilities, the ALJ's RFC determination was not supported by substantial evidence, and the Court reverses for further consideration.  Because reversal is required by this issue, the other points Gordon-Horton makes on appeal are not discussed in detail.  However, the Court notes that it appears that the ALJ erred at Step Five when he found that Gordon-Horton had a high school education.

At Step Five, the burden shifts to the Commissioner to show that there are jobs in significant numbers that the claimant can perform taking into account her age, education, work experience and RFC.  *Haddock v. Apfel*, 196 F.3d 1084, 1088-89 (10th Cir. 1999).  The ALJ is allowed to do this through the testimony of a vocational expert (the "VE").  *Id.* at 1089.  Gordon-Horton cites to *Dollar v. Bowen*, 821 F.2d 530, 535 (10th Cir. 1987) in support of her argument that the ALJ did not correctly state her educational status in the hypothetical to the VE when he described her as having a high school education.  (R. 25, 65).  In *Dollar*, the claimant was functionally illiterate, but the ALJ had placed him in the category of "limited or less" education because he had completed eighth grade.  *Dollar*, 821 F.2d at 535.  The Tenth Circuit said that this statement of the claimant's educational status was in error and therefore the ALJ's use of the

"Grids"[9] to find him not disabled was also erroneous. *Dollar* was based on a regulation that remains in place today. 20 C.F.R. § 416.964(b). While the determination would need to be made by the ALJ, it appears that, pursuant to Section 416.964(b), Gordon-Horton's educational level should have been stated as "illiteracy" or "marginal education."

The Commissioner argues, essentially, harmless error, asserting that Gordon-Horton's arguments should be disregarded because the jobs that the VE identified in response to the ALJ's hypothetical are in the lowest category of language ability pursuant to the Dictionary of Occupational Titles (the "DOT"). Commissioner's Response Brief, Dkt. #20, pp. 5-7. It is true that the ALJ's reliance here on testimony of the VE distinguishes this case from the ALJ's use of the Grids in *Dollar*. The VE's testimony here, however, appears to have been somewhat equivocal, because he indicated that factors that could have been found to be true in Gordon-Horton's case could have changed his testimony significantly. (R. 68-69). The VE testified that a need for close supervision precludes competitive work and that GAF scores of 50 and below generally preclude work due to wide-ranging factors such as ability to concentrate, ability to interact, and ability to produce. *Id.* Given the delicate balance on which the VE's testimony apparently rested, an accurate characterization of Gordon-Horton's education may have been important to the VE's consideration. On remand, the ALJ should ensure, pursuant to 20 C.F.R. § 416.964(b), that Gordon-Horton's education status is correctly stated.

The undersigned does not address the remaining contentions of Gordon-Horton. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Gordon-Horton.

---

[9] The Grids are the Medical-Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2.

This Court takes no position on the merits of Gordon-Horton's disability claim, and "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 24th day of July 2013.

_____
Paul J. Cleary
United States Magistrate Judge